UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL A. JOSEPH,

      Plaintiff,

                                        Case No. 1:07-cv-541

v

                                        Hon. Wendell A. Miles

ICG CASTINGS, INC., d/b/a
INVERNESS CASTING GROUP, INC.,

      Defendant.

_____/

OPINION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

      Plaintiff Michael A. Joseph filed this action against his former employer, ICG Castings, Inc. ("ICG" or "the company"), alleging that the company violated his rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., and Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), M.C.L. § 37.2101 *et seq*.  The matter is currently before the court on a motion by ICG for summary judgment (docket no. 20).  Plaintiff has opposed the motion.

      For the following reasons, the court grants the motion.

**I**

      Plaintiff Michael A. Joseph is an African American male.  He began working as a die cast operator for ICG in Dowagiac, Michigan in May, 2000.  Plaintiff was terminated from his employment with the company in November, 2006, following an altercation with co-worker Bobby Gordon, who is apparently Caucasian. During the altercation, Gordon used a racial epithet and plaintiff threatened to beat up Gordon.  Gordon was also fired for his part in the

altercation.  The company has in place a written policy which prohibits not only acts or threats of violence, but also harassment in any form.[1]

The altercation between plaintiff and Gordon took place on November 9, 2006.  At work that day, plaintiff borrowed a hammer from Gordon.  Although plaintiff returned the tool, he alleges that Gordon later confronted him, demanding "where's my f___ing hammer," or words to that effect.  Plaintiff then retrieved the hammer from its location and gave it to Gordon.  However, as plaintiff began to walk away, Gordon threw some bolts at him.  The bolts missed hitting plaintiff, who informed Gordon that he was lucky he did not hit plaintiff with the "mother f__ [ing]" bolts.  Gordon then uttered a racial slur and forcefully threw the hammer onto a table.

The argument between plaintiff and Gordon continued later in the company locker room after the end of the work shift. According to plaintiff, Gordon walked into the locker room and overheard plaintiff telling another co-worker about the incident with Gordon.  Gordon then told plaintiff, "you just keep f___ing talking."  Plaintiff in turn responded by threatening to either

---

[1]The written policy provides as follows:

The Company and Union are committed in our belief that all our employees should be able to work in an atmosphere free from all forms of hostility and harassment.  Therefore, it is our policy to prohibit any acts or threats of violence as well as harassment in any form, including but not limited to harassment based on: sex, race, color, creed, religion, national origin, age or disability.  Accordingly, hostility and/or harassment, whether by a fellow employee, a customer, a guest, or a member of management, will not be tolerated.  Activities of this nature are unlawful and serve no legitimate purpose; they have a disruptive effect on your ability to perform your job and undermine the integrity of the employment relationship.

It is your responsibility to report any act of hostility or harassment to your supervisor, union official, or the Vice President of Human Resources.  Violators of this policy will be severely dealt with.

"kick" or "beat" Gordon's "ass."

Plaintiff and Gordon went to ICG's plant manager, Dave Thompson.  Plaintiff informed Thompson that Gordon had used a racial epithet.  Gordon initially denied having done so, but later recanted his denial and admitted directing a racial slur at plaintiff.  After conducting an investigation of the incident, the company terminated both plaintiff and Gordon.

Before the November 9, 2006 incident, plaintiff and Gordon had each had been disciplined for previous infractions of company policy.  In February, 2006, Gordon was involved in an incident which resulted in his being suspended from his employment for four days.  After Gordon returned to the workplace during his suspension, the company also sought a personal protection order which prohibited Gordon from appearing on ICG premises during his suspension.

In March, 2006, plaintiff was involved in a verbal altercation with another fellow employee, Kenny Kruger.  During the incident, plaintiff and Kruger exchanged angry words and Kruger called plaintiff a racial epithet.  Plaintiff provided his union with a written statement about the incident, and also alleges that he made a complaint regarding the incident with the Equal Employment Opportunity Commission ("EEOC").  According to plaintiff, although Kruger denied using a racial epithet and there were no witnesses to corroborate plaintiff's version of the incident, Kruger was transferred to another plant and demoted from his position as group leader as a result of the incident.[2]  Plaintiff himself, who has admitted to "cussing and yelling" at Kruger, was suspended for his part in the altercation, at least a part of which was

---

[2]Although plaintiff's complaint alleges that Kruger was merely transferred, plaintiff has since admitted, during deposition testimony, that Kruger was demoted.

3

apparently overheard by others in the plant.

In 2001 or 2002, plaintiff purchased a new truck.  He apparently drove the truck to work at ICG, and at some point he began to discover what he believed was spit on his truck windows after the end of his shifts.  Although there is evidence that plaintiff complained to ICG management about the spit, there is no evidence that plaintiff indicated to ICG that he believed the incidents to be racially motivated.

In addition, on at least five occasions during the course of his employment, plaintiff observed racial epithets written inside the stalls of the company's men's restroom.  It is unclear whether plaintiff complained to ICG management about the graffiti, although he apparently did discuss the matter with his union steward.  Although the perpetrator or perpetrators responsible for the graffiti were not identified, it is undisputed that each time the company became aware of the graffiti, it was painted over with black spray paint.

On June 6, 2007, plaintiff filed a three-count complaint against ICG alleging race discrimination in connection with his termination, race discrimination in the form of a hostile work environment, and retaliation, all in violation of Title VII and the ELCRA.  Plaintiff's complaint seeks relief including damages, both compensatory and punitive, and reinstatement. Discovery in the action has concluded.  The current motion is fully briefed and ripe for decision.


## II

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  In

evaluating a motion for summary judgment, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-252 (1986). The party moving for summary judgment bears the burden of establishing the non-existence of any genuine issue of material fact and may satisfy this burden by "'showing'-- that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party satisfies that burden in its motion, the party opposing the motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the [non-moving party]." Id. at 252. Where the non-moving party is the plaintiff, he can no longer rely "merely on allegations," but must set "set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e)(2).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, at 322-323. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. Only factual disputes which may have an effect on the outcome of a lawsuit under the applicable substantive law are "material." Anderson, 477 U.S. at 248. Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. Elvis Presley Enters, Inc. v. Elvisly Yours, Inc., 936 F.2d 889, 895 (6th Cir. 1991).

In reviewing a motion for summary judgment, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. Anderson, 477 U.S. at 255. Where the moving and non-moving parties' versions of events differ in material respects, courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion.  Scott v. Harris, 127 S.Ct. 1769, 1774-1775 (2007).   The weighing of evidence and making of credibility determinations is prohibited on summary judgment.  Keweenaw Bay Indian Community v. Rising, 477 F.3d 881, 886 (6th Cir. 2007); see Anderson, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge").

Rule 56(e)(1) requires supporting and opposing affidavits to "set out facts that would be admissible in evidence."  Although this does not mean that a party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment, Celotex, 477 U.S. at 324, materials submitted in opposition to a motion for summary judgment must be based on personal knowledge and contain competent, nonhearsay evidence.  Alpert v. U.S., 481 F.3d 404, 409 (6th Cir. 2007).  "Hearsay evidence, as well as evidence which is irrelevant to the issue presented, must be disregarded."  U.S. Structures, Inc. v. J.P. Structures, Inc., 130 F.3d 1185, 1189 (6th Cir. 1997); see also Carter v. Univ. of Toledo, 349 F.3d 269, 274 (6th Cir. 2003) ( "If the [offered] comments are deemed to be hearsay, then the evidence could not be considered on summary judgment." )

### III

Plaintiff has asserted discrimination claims under both Title VII and the ELCRA, which include claims of disparate treatment and harassment based on race, and retaliation.  ICG's motion attacks each of these claims.

Title VII provides, in relevant part, that "It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race[.]"  42 U.S.C. § 2000e-2(a)(1).  Similarly, Michigan's ELCRA provides in pertinent part, that a employer shall not "Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status."  M.C.L. 37.2202(1)(a).

Each of these statutes also contains an anti-retaliation provision.   See Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 56 (2006); McLemore v. Detroit Receiving Hosp. and University Medical Ctr.,  493 N.W.2d 441, 443 (Mich. Ct. App. 1992).  Title VII makes it unlawful "for an employer to discriminate against any of his employees . . . to discriminate against any individual . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).   Similarly, the ELCRA provides, in pertinent part, that "a person shall not . . . [r]etaliate or discriminate against a person because the person has opposed a violation of

this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act."  M.C.L. § 37.2701(a).

Because the language of the ELCRA strongly parallels the language of its federal counterpart, Michigan courts generally look to Title VII precedent in deciding discrimination claims.  See, e.g., Hartleip v. McNeilab, Inc., 83 F.3d 767, 775 (6th Cir. 1996); Radtke v. Everett, 501 N.W.2d 155, 162 (Mich. 1993).  Therefore, claims of race discrimination brought under the ELCRA are analyzed under the same standards as claims of race discrimination brought under Title VII.  See Jackson v. Quanex Corp., 191 F.3d 647, 658 (6th Cir. 1999); Sutherland v. Michigan Dept. of Treasury, 344 F.3d 603, 614 n.4 (6th Cir. 2003).  Because the ELCRA is otherwise analyzed by reference to Title VII law, Title VII principles should also apply to retaliation claims brought under the ELCRA.  David v. ANA Television Network, Inc., Nos. 98-2288, 98-2289, 2000 WL 222575, *5 (6th Cir. Feb. 16, 2000).


## A

## Race Discrimination – Disparate Treatment

In Count I of his complaint, plaintiff alleges that his race was a factor in his termination. In a case such as this alleging disparate treatment based on a prohibited factor, "[p]roof of discriminatory motive is critical[.]"  International Broth. of Teamsters v. United States, 431 U.S. 324, 335 (1977).  "Such proof can be established by direct evidence or may be inferred based on a prima facie showing of discrimination."  Huguley v. General Motors Corp.,  52 F.3d 1364, 1370 (6th Cir. 1995) (citations omitted).  Here, plaintiff does not dispute that success on his claim of disparate treatment requires him to establish a prima facie case of discrimination, insofar as

8

direct evidence of a discriminatory motive is lacking.

"As the Sixth Circuit has frequently phrased the requirements of a prima facie claim of disparate treatment using such a 'comparable non-protected person was treated better' element as one of the requisites, the plaintiff must produce evidence which at a minimum establishes (1) that he was a member of a protected class and (2) that for the same or similar conduct he was treated differently than similarly-situated non-minority employees."  Mitchell v. Toledo Hosp., 964 F.2d 577, 582-583 (6th Cir. 1992) (citations omitted).  "It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the 'comparables' are similarly-situated *in all respects*."  Id. at 583 (emphasis in original; citation omitted).  "Thus, to be deemed 'similarly-situated,' the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  Id. at 583 (citations omitted); see General Motors Corp. v. Tracy, 519 U.S. 278, 298-299 (1997) ("Conceptually, of course, any notion of discrimination assumes a comparison" of the "substantially similar") (footnote omitted).

There is no dispute that plaintiff is a member of a protected class.  However, in its motion, ICG argues that plaintiff cannot establish a prima facie case of disparate treatment based on his race because the most similarly situated nonminority employee, Bobby Gordon, was involved in the same altercation and was also fired for his conduct.  According to ICG, because plaintiff and Gordon were both fired, plaintiff cannot establish that he was treated less favorably than Gordon for the same or similar conduct.

In response, plaintiff does not dispute that he deems Gordon to be the similarly situated comparable for purposes of a claim of disparate treatment.[3]  However, plaintiff argues that the incident for which Gordon was treated less severely than plaintiff occurred before the November, 2006 incident for which both men were fired.  Specifically, plaintiff argues that Gordon was treated more favorably in connection with the February, 2006 incident because he was merely suspended, but not fired, for threatening violence in the workplace.  Plaintiff contends that during that prior incident, he personally heard Gordon threaten to get a gun and "shoot up the whole damn place," meaning ICG.  However, plaintiff admits that he did not tell anyone about what he heard, and ICG contends that it was not aware that Gordon had made any direct threat of violence.  ICG contends that it "sent [Gordon] home" after it was made aware he had engaged in "certain unacceptable behavior," which apparently included reporting to work under the influence of drugs and making an obscene gesture.

Plaintiff, however, has not shown that his comparison to this prior incident involving Gordon is an apt one.  For one thing, even if plaintiff should show that ICG was aware of Gordon's threat to "shoot up the whole damn place," plaintiff has not pointed to evidence that Gordon was disciplined by the same supervisor or decisionmaker in connection with the prior

---

[3]In his brief, although plaintiff states that he "would not necessarily choose Gordon as a comparable," plaintiff accepts, for purposes of responding to ICG's motion, that his behavior may be compared to Gordon's.  Amended Response to Motion for Summary Judgment at 6-7.

The burden is on plaintiff, not ICG, to identify an individual with whom he is similarly situated for purposes of his claim that he was fired because of his race.  See Kampmier v. Emeritus Corp., 472 F.3d 930, 938 (7th Cir. 2007) (summary judgment properly granted in favor of defendant, where plaintiff failed to identify a similarly situated individual who received more favorable treatment).  In his brief, plaintiff does not argue that there is anyone other than Gordon to whom plaintiff may be similarly situated, at least for purposes of the claim of wrongful termination based on race asserted in Count I of the complaint.

incident. Even more importantly, however, Gordon's prior participation in behavior for which he was suspended in fact makes him even more similarly situated to plaintiff, who had also been suspended for his prior confrontation with Kenny Kruger.  In fact, the letter which plaintiff received notifying him of his termination expressly informed plaintiff that "This incident makes the second occurrence we are aware of, in which you have been involved in an altercation, and threatened physical violence."  Plaintiff's Exhibit D.  Therefore, both plaintiff and Gordon were given a second chance.  Under the circumstances, plaintiff has failed to create a prima facie case that he was treated less favorably than Gordon.

However, even if plaintiff could establish a prima facie case, this would merely shift the burden to ICG to offer a legitimate, non-discriminatory reason for firing plaintiff.  Sutherland, 344 F.3d at 614-615.  If the company meets this burden, then the burden of production shifts back to plaintiff to demonstrate that this proffered reason is a pretext.  Id.  Here, ICG has articulated a legitimate, non-discriminatory reason for relieving plaintiff of his employment: he threatened violence against a co-worker.  Even if such behavior had not been a violation of written company policy, ICG would have been well within its rights to fire plaintiff for threatening Gordon with violence.[4]

---

[4]With its motion filed in this case, ICG has provided a portion of a deposition Gordon gave in a case he filed against ICG after his own termination.  In that case, Gordon v. ICG Castings, Inc., No. 1:07cv221, Gordon unsuccessfully claimed, among other things, that ICG violated the ELCRA by treating Gordon less favorably than Joseph.  (Gordon was under the mistaken impression that Joseph had not been fired for his part in the November, 2006 confrontation.)

Plaintiff states that he objects to ICG referencing Gordon's lawsuit because Joseph was neither a party nor witness to that lawsuit, and because ICG did not disclose the existence of that lawsuit in answers to interrogatories.  However, plaintiff does not indicate why Gordon's testimony – apart from any deposition he gave in another case – would be legally inadmissible if he was called to testify in this action in defense of a claim by plaintiff that Gordon is similarly

(continued...)

Plaintiff cannot show that this explanation for his termination is not a legitimate one. Instead, in attempting to demonstrate pretext, plaintiff appears to focus on what he argues was the lack of a "thorough investigation" into the incident for which he was fired. However, plaintiff himself concedes that he provided ICG with his own written account of the incident on the day it occurred. Plaintiff's Exhibit B. In addition, notwithstanding plaintiff's unsupported contention that the company did not contact him until he was terminated a few weeks after the incident, the evidence shows that plaintiff was in fact interviewed about the incident by his supervisor. As part of its investigation following the incident, the company also interviewed Gordon, as well as two other employees who apparently witnessed the confrontation in the locker room. Plaintiff has not pointed to any evidence indicating that the company failed to properly investigate the incident with Gordon, and he certainly has not pointed to facts showing that he did not engage in the behavior for which he was fired.[5] Because plaintiff has failed to establish a prima facie case of discrimination in connection with his termination, and because he has failed to point to evidence of pretext, ICG is entitled to summary judgment in its favor on Count I of the complaint, the claim for race discrimination based on wrongful termination.

_____

[4](...continued)
situated but received preferential treatment. See Ballis v. Evans, No. 84 C 9340, 1989 WL 158012, *2 (N.D. Ill. Dec. 20, 1989) (the use of depositions from another case could be considered on motion for summary judgment; regardless of whether the depositions themselves would be admissible if read at trial, they could be used if they contain testimony which would be admissible if the deponent testified at trial). In addition, plaintiff has not indicated whether he has attempted to depose Gordon in this action, nor has plaintiff availed himself of the specific procedure provided in Fed.R.Civ.P. 56(f) when affidavits are unavailable.

[5]Plaintiff has conceded that he "threatened, but did not commit, violent action against Gordon." Amended Response to Motion for Summary Judgment at 2.

**B**

**Harassment – Hostile Working Environment**

In Count II of his complaint, plaintiff alleges that ICG created a work environment hostile to African American employees, and that he himself was subjected to harassment based on his race during his employment with the company.   In support of his claim that he was subjected to a hostile working environment, plaintiff has pointed to the following circumstances: (1) the two separate incidents involving Kruger and Gordon using racial slurs in March and November, 2006, respectively; (2) the appearance, on an unspecified number of occasions, of racial slurs written inside bathroom stalls at ICG; and (3) the incidents in which spit appeared on plaintiff's truck windows.[6]

Both Title VII and the ELCRA prohibit harassment based on race which creates a hostile or abusive work environment.   To establish a hostile work environment claim based on race under either statute, a plaintiff must prove the following elements:  (1) he is a member of a protected class; (2) that he was subjected to unwelcome harassment; (3) that the harassment was based on race; (4) that the harassment had the effect of unreasonably interfering with his work performance by creating an intimidating, hostile, or offensive work environment; and (5) the

---

[6]Plaintiff's complaint alleges that ICG "has been the subject of a number of incidents involving accusations of racial discrimination and a hostile work environment by its African American employees."  Complaint at 3, ¶ 17.  Although plaintiff repeats this allegation virtually verbatim in his brief in response to ICG's motion, his only record cite for this allegation is a single page of his own deposition testimony, during which he identified only one other African American employee, Calvin King, who plaintiff has testified was "suspended or fired or whatever because they said that he was asleep."  Plaintiff's Dep. at 76.  Plaintiff has not provided any admissible, nonhearsay evidence, such as the testimony of King or any other African American employees, who were the alleged subjects of these other "incidents" of discrimination. For that reason, these alleged incidents do not figure in the court's analysis.

existence of employer liability.  <u>Newman v. Federal Express Corp.</u>, 266 F.3d 401, 405 (6th Cir. 2001); <u>see</u> <u>also</u> <u>Radtke</u>, 501 N.W.2d at162.  In its motion, ICG focuses on the final element of employer liability.  Under the circumstances, the court will not in this decision address the additional required elements of plaintiff's claim.[7]

Even if a hostile work environment is established by the employee as part of the first four required elements of his claim, an employee alleging harassment by a coworker must still establish that the employer is liable "because it knew or should have known of the harassment, yet failed to take prompt and appropriate corrective action."  <u>Hawkins v. Anheuser-Busch, Inc.</u>, 517 F.3d 321, 338 (6th Cir. 2008); <u>see</u> <u>also</u> <u>Chambers v. Trettco, Inc.</u>, 614 N.W.2d 910, 916 (Mich. 2000) (under the final element, "[t]he bottom line is that, in cases involving a hostile work environment claim, a plaintiff must show some *fault* on the part of the employer. That is the essence of [the] requirement that a plaintiff prove that the employer failed to take prompt and adequate remedial action upon notice of the creation of a hostile work environment") (emphasis in original; citation omitted).  Notice of harassment is adequate "if, by an objective standard, the totality of the circumstances were such that a reasonable employer would have been aware of a substantial probability that [the] harassment was occurring." <u>Id</u>. at 919.  "[A]ctual notice to the employer is not required; rather, the test is whether the employer knew or should have known of the harassment."  <u>Elezovic v. Ford Motor Co.</u>  697 N.W.2d 851, 861 (Mich. 2005).

Here, ICG argues that it is not liable for any racial harassment committed by plaintiff's

---

[7]ICG does argue, regarding the truck-spitting incident or incidents, that there is no evidence that this was done based on plaintiff's race.  Although the court agrees that evidence that the spitting was racially motivated is lacking, this argument alone does not address the remaining circumstances which plaintiff alleges created a racially hostile environment.

14

co-workers because it responded promptly, adequately, and effectively each time it had notice of any behavior which could be viewed as racial harassment.  Specifically, ICG contends that it took reasonable steps under the circumstances to "correct" the bathroom graffiti (whose author was unknown) by painting over it as soon as it appeared.  ICG also argues it demoted Kruger from a group leader position even though he denied using a racial epithet in his confrontation with plaintiff, and even though there were no other witnesses to corroborate plaintiff's version of what Kruger said.  Finally, the company contends that it took action by firing Gordon for using a racial slur against plaintiff.

Although plaintiff credits ICG with painting over the bathroom graffiti, he argues that ICG's efforts were insufficient because this did not stop the graffiti from reappearing and the company did not conduct an investigation or undertake to educate its employees about such improper behavior.  Plaintiff also appears to take issue with the company's decision to demote Kruger; although he does not dispute that Kruger was demoted, plaintiff argues that Kruger was "shuffled aside" and "transferred to another plant."

Plaintiff also concedes that Gordon was fired, but he argues that this was only "the culmination of a number of questionable behaviors by him."  Plaintiff's Amended Response at 8 (footnote omitted).   Plaintiff has not elaborated precisely what "behaviors" Gordon engaged in apart from those in February and November, 2006, both of which were met by the company with disciplinary action.  Plaintiff also appears to see relevance in what he characterizes as an unsuccessful attempt to get a supervisor to "defuse the situation" with Gordon on November 9, 2006.  In his complaint, plaintiff alleges that he enlisted co-worker Ronnie Nickers (whom plaintiff misidentifies as "Nickerson") to seek the assistance of group leader Steve Massey with

15

the situation.  Specifically, plaintiff alleges that Nickers "told Massey what happened, to which

Massey responded, "I don't give a f___ what [Gordon] called [plaintiff]."  Complaint at 4, ¶ 30.

Plaintiff has repeated this allegation in his brief in response to ICG's motion.  However, plaintiff

has not provided any supporting factual, nonhearsay materials which confirm either the

purported quote from Massey, or even what Massey was told by Nickers.  (If plaintiff were to

testify about the conversation between Nickers and Massey, this would be hearsay.)  Plaintiff has

provided only a short, unsworn handwritten note in which Nickers states he told Massey "that

[plaintiff] wanted to talk to him about something that Bobby Gordon said to him.  Steve Massey

replied I don't give a fuck and walked off."  Plaintiff's Exhibit C.  Nickers' handwritten note

does not state that he told Massey that Gordon had used a racial epithet.  Such evidence is not

sufficient to raise a material factual issue regarding whether the company refused to "defuse" the

situation with Gordon, when the facts show that plaintiff's complaint to plant manager Dave

Thompson was investigated.

Viewing the evidence in plaintiff's favor as required, the court must nonetheless

conclude that ICG is correct:  plaintiff has failed to point to the existence of a genuine issue of

material fact indicating that the company failed to take prompt and appropriate corrective action

when it learned of the specified instances of alleged harassment.  In each identified instance,

there is no dispute that the company responded promptly.  Plaintiff merely questions the

adequacy of the response.  The evidence shows that after the only two incidents in which

plaintiff alleged that a co-worker used a racial slur directly against him, the company took

disciplinary action against the individual involved, even though, with respect to Kruger, it was

his word against plaintiff's.  The company also imposed the ultimate sanction of dismissal

against Gordon after he admitted using a racial slur against plaintiff.  It is therefore simply not possible to say that ICG did not take appropriate remedial action in response to these incidents.

With respect to the graffiti, plaintiff contends that the company should have done more to remedy the situation apart from merely painting over the offending words.   However, the author of the graffiti was unknown, and given its location – inside a bathroom stall – it was not likely that an investigation could be undertaken which would expose the perpetrator (so to speak). Although the graffiti reappeared on more than one occasion, plaintiff does not dispute that the company responded each time until the graffiti presumably stopped reappearing.  (Plaintiff does not dispute that it stopped, for he does not contend that it continued throughout his approximately six years with the company.)  Therefore, even though plaintiff suggests that ICG should have done more, such as having its employees participate in "education" designed to instruct them in the impropriety of using racial epithets, there is no apparent purpose which would have been served by such action.   The author or authors of the graffiti clearly knew they were doing wrong, for they hid their actions in the privacy of a bathroom stall.  In addition, the company had a published policy against harassment, and demonstrated that it was willing to take disciplinary action against persons who violated that policy, such as Kruger and Gordon.

This case is not like Jackson v. Quanex Corp.  191 F.3d at 647, in which the court reversed a district court decision granting judgment as a matter of law in favor of the defendant in a case alleging racial harassment based – in part – on racist graffiti.  The graffiti in that case was regularly observed not just in restrooms but also in public areas.  Id. at 652.  In one public area, the graffiti remained for at least two years.  Id.  In addition, although management was notified of racist graffiti which appeared regularly in restrooms, the company either did not take

17

care of the problem immediately or did not do so at all.  Id.  As the court observed in Jackson,

despite its knowledge of what was happening, the company was "slow to eliminate racially

offensive graffiti when it learned of it, and made no effort to discover the perpetrators."  Id. at

663.  As a result, the graffiti continued throughout the entire period of time that the plaintiff

worked at the company.  Id.  In addition, the court noted, the case revealed a "pattern of

unresponsiveness" by the company to the complaints of its African American employees.  Id. at

665.  Under the circumstances, the court held that the district court erred in taking the plaintiff's

case away from a jury.  Id. at 668.

The present case is instead more like Davis v. Monsanto Chemical Co., 858 F.2d 345 (6th

Cir. 1988), in which the court affirmed a district court ruling granting summary judgment in

favor of the employer, where the evidence clearly showed that the company "did not tolerate the

alleged harassment" and, when informed of a potential problem, "took quick and appropriate

measures to remedy the situation."  Id. at 349.  This included painting over graffiti written on

bathroom walls.  Id. at 349-350.  Moreover, when one plaintiff reported to his supervisor that

someone had altered and spit on his timecard, a notice was posted saying that such conduct was

unacceptable, even though the behavior was not clearly racially motivated.  (The conduct was

not repeated.)  Id. at 347-350.

In the present case, the company likewise immediately painted over racist graffiti, thus

indicating that it would not tolerate the presence of such graffiti on it premises.  Although the

graffiti reappeared, there is no dispute that the company responded promptly each time the

graffiti was reported.  The company, which had a posted policy prohibiting harassment, also

demoted and transferred Kruger for using a racial slur against plaintiff.  It also fired Gordon after

18

he engaged in the same behavior.  Therefore, the facts show that the company did take some action regarding these incidents, and under the circumstances it is simply not possible to conclude that the company failed to act reasonably.  Because plaintiff has failed to demonstrate that a factual issue remains regarding the adequacy of  measures taken by ICG, the court concludes that the company is entitled to summary judgment in its favor on plaintiff's hostile environment claim contained in Count II of the complaint.

## C

### Retaliation

In Count III of his complaint, plaintiff alleges that ICG terminated him in retaliation for his complaints about the incidents of March and November, 2006 in which racial slurs were used against him.  Section § 2000e-3(a) of Title 42 forbids discrimination against any individual "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  Similarly, the ELCRA provides that "a person shall not . . . [r]etaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act." M.C.L. 37.2701(a).

Under either statute, a plaintiff alleging retaliation in the absence of direct evidence may, as with a disparate treatment claim, establish his claim through the indirect method.  This indirect method requires the plaintiff to establish the following elements of a prima facie case of

retaliation: (1) that he engaged in a protected activity; (2) that the defendant knew of this exercise of protected rights by the plaintiff; (3) that the defendant thereafter took employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action. Morris v. Oldham County Fiscal Court, 201 F.3d 784, 792 (6th Cir. 2000); Garg v. Macomb County Community Mental Health Services, 696 N.W.2d 646, 653 (Mich. 2005), amended on denial of rehearing (July 18, 2005). If and when the plaintiff establishes a prima facie case, the burden of production of evidence shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for its actions. Morris, 201 F.3d at 792-793 (citation omitted). If the employer does so, then the plaintiff, "who bears the burden of persuasion throughout the entire process, then must demonstrate 'that the proffered reason was not the true reason for the employment decision.'" Morris, 291 F.3d at 793 (citation omitted).

In its motion, ICG does not dispute plaintiff's ability to establish the first three required elements of his claim of retaliation. What the company does dispute is plaintiff's ability to establish the fourth element of his claim: a causal connection between plaintiff's exercise of protected rights and his termination. In order to show a causal connection, a plaintiff must produce sufficient evidence from which an inference can be drawn that the adverse action would not have been taken had the plaintiff not engaged in protected activity. Allen v. Michigan Dept. of Corrections, 165 F.3d 405, 413 (6th Cir. 1999). "Although no one factor is dispositive in establishing a causal connection, evidence that the defendant treated the plaintiff differently from identically situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation." Id.

In this case, plaintiff argues that the fact that he complained about Gordon's use of a racial slur on November 9, 2006 and was terminated not long afterward permits an inference to be drawn that he was terminated at least in part for engaging in protected activity. "Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 525 (6th Cir. 2008).[8] Here, plaintiff made his complaint about Gordon's use of a racial slur on November 9, 2006, and he was terminated on or about November 27, 2006. In between those two dates, ICG conducted an investigation in which it determined – and plaintiff does not dispute – that he had threatened to beat up Gordon. The evidence also shows that Gordon himself was terminated several days before plaintiff, for participation in the confrontation with plaintiff, during which Gordon called plaintiff a racially derogatory term.

Even if temporal proximity alone could establish a causal connection, see Mickey, 516 F.3d at 523 -525 (discussing how, in some cases, causal connection can be inferred where an

---

[8]"Although Michigan courts assess claims of retaliation under the ELCRA using the same general framework as that used by federal courts, ... the standard for causation is higher." Mickey v. Zeidler Tool and Die Co., 516 F.3d 516, 523 n.2 (6th Cir. 2008) (citation omitted). Michigan courts have held that in order to establish causation, the plaintiff must show that his participation in activity protected by the ELCRA was a "significant factor" in the employer's adverse employment action, not just that there was a causal link between the two. Barrett v. Kirtland Community College, 628 N.W.2d 63, 70 (Mich. Ct. App. 2001). "A causal connection can be established through circumstantial evidence, such as close temporal proximity between the protected activity and adverse actions, as long as the evidence would enable a reasonable fact-finder to infer that an action had a discriminatory or retaliatory basis." Rymal v. Baergen, 686 N.W.2d 241, 257 (Mich. Ct. App. 2004).

employer fires an employee immediately after learning of a protected activity), this merely shifts the burden to ICG to articulate a nondiscriminatory reason for its actions.  <u>Id</u>. at 526.  If ICG articulates such a reason, plaintiff – who at all times retains the burden of persuasion –  may then show that the company's stated reason is merely a pretext for discrimination.  <u>Id</u>.  "A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct."  <u>Id</u>. (citation omitted).   The plaintiff must produce sufficient evidence from which the factfinder  could reasonably reject the employer's explanation and infer that it did not honestly believe in the proffered nondiscriminatory reason for its adverse employment action.  <u>Id</u>. citations omitted).  "To show an honest belief, 'the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made.'"  <u>Id</u>. (quoting <u>Smith v. Chrysler Corp.</u>, 155 F.3d 799, 806-807 (6th Cir.1998)).

Here, ICG contends that it fired plaintiff because he threatened to beat up Gordon.  Plaintiff concedes that he made this threat, and therefore he cannot dispute that ICG correctly assessed the facts, i.e., that a threat was made and that plaintiff made it.  Moreover, plaintiff has not shown that threatening a co-worker with violence was an insufficient basis for dismissal, nor is it likely that he could do so, considering that ICG's written policy warned that such infractions would be "severely dealt with."  In addition, for the same reasons discussed above in connection with plaintiff's disparate treatment claim, plaintiff has not shown that he was treated differently from Gordon, who had also been warned months earlier that he could be terminated for violating the company's written policy prohibiting all forms of harassment and threats of violence – and who, at the time, had not engaged in protected conduct.  Under the circumstances, because ICG

has shown a legitimate, nonretaliatory reason for its actions, which plaintiff has been unable to rebut with evidence that raises a genuine issue of material fact as to whether that reason was a pretext for retaliation, ICG is entitled to summary judgment in its favor as a matter of law on plaintiff's retaliation claim contained in Count III of the complaint.

## Conclusion

The court grants the defendants' motion for summary judgment in its entirety.

So ordered this 2nd day of December, 2008.

/s/ Wendell A. Miles
Wendell A. Miles, Senior Judge